[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 01-16485

_____

D. C. Docket No. 99-01259 CV-DMM

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 18, 2005
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

$242, 484.00,

Defendant,

DEBORAH STANFORD, individually and as
President, Director, and Stockholder
of Mike's Import & Exports, U.S.A., a
Florida corporation,

Claimant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 18, 2005)

Before EDMONDSON, Chief Judge, ANDERSON, Circuit Judge, and POGUE[*],
Judge.

---

[*] Honorable Donald C. Pogue, Judge, United States Court of International Trade, sitting
by designation.

PER CURIAM:

This case comes before us on remand from this Court's en banc decision in United States v. $242, 484.00. 389 F.3d 1149, 1168 (11th Cir. 2004). The case originally arose out of a civil forfeiture action applying 21 U.S.C. § 881(a)(6) -- the version in effect before the 2000 amendments -- which provided for the forfeiture of money linked to drug crimes. The district court ordered the forfeiture of $242,484.00 seized from claimant-appellant Deborah Stanford. Stanford appealed, arguing that her Fourth Amendment rights were violated and that the government lacked probable cause to seize the defendant currency. A panel of this Court agreed that the circumstances were insufficient to establish probable cause and ordered the currency returned to Stanford. The panel's order was vacated when this Court decided to rehear the case en banc.

The en banc court affirmed the district court's ruling that the government established probable cause for the forfeiture of the defendant currency and remanded any remaining issues to the panel. We now consider whether Stanford's Fourth Amendment rights were violated in the course of the encounter that led to the seizure of the defendant currency. Because we conclude that Stanford consented to the initial interview with the DEA agents and to the agents' request that she accompany them to an office for further questioning, we hold that no constitutional violation occurred and

2

affirm the district court's forfeiture order.

## I. BACKGROUND

On December 14, 1998, Deborah Stanford flew from New York City to Miami, Florida. When airport personnel in New York questioned her about the contents of two packages in her backpack, Stanford became belligerent. She eventually removed the packages and revealed that they contained large amounts of currency. One worker attempted to confiscate the currency, but was countermanded by a superior.

Although Stanford was allowed to board her flight with the currency, an airport security worker approached Drug Enforcement Agency Agent Bradley Cheek and told him what had happened. Agent Cheek relayed the information to DEA Special Agent Kenneth Miles at the Miami International Airport. He described Stanford and said that she was carrying a large amount of cash in her backpack. Agents Miles and John Eric Johnson then went to the gate where Stanford's plane was to arrive.

When Stanford exited her plane in Miami, the two agents recognized her based on Agent Cheek's description. They approached Stanford and showed their DEA credentials. They told her that their job was to contact people and seek their help in combating drug flow, asked her if she would talk to them and consent to a search of her baggage, and advised her that she was not required to do so. She consented. The agents asked to see her plane ticket and driver's license, and she complied. The agents

3

confirmed that the names on the ticket and license matched and returned the items to Stanford. Agent Miles asked if Stanford was carrying any contraband or large sums of money, and she replied that she was carrying "about two." When asked what she meant by this, Stanford told Agent Miles that she had "about two hundred thousand" dollars in her backpack. Agent Miles asked to see the contents of the backpack, and Stanford consented. Inside the pack, Agent Miles found two large packages, one wrapped in black cellophane and one wrapped in plastic cellophane inside a Christmas shopping bag. He asked Stanford's permission to poke holes in the wrapping, and she consented. Each package contained large, non-uniform bundles of currency.

At that point, Agent Miles asked Stanford to accompany the agents to the airport's DEA office. Stanford agreed. Agent Miles testified that she answered "sure." She then walked with the agents to the office, with Agent Miles carrying the backpack containing the currency. Agent Johnson walked in front of Stanford, while Agent Miles trailed slightly behind her. Neither agent touched Stanford, nor did they display any weapon.

When the group reached the DEA office, Agent Miles proceeded to question Stanford about the reason for her trip to New York and the source of the currency. Stanford said that she had gone to New York for a civil trial arising out of a traffic accident she had been involved in ten years earlier, but she was unable to produce any

4

documents relating to the court case. As for the source of the currency, Stanford claimed that her brother contacted her while she was in New York and asked her to pick up some money for Mike's Import & Export USA, Inc. ("Mike's"), a business with which both siblings were associated.[1] Stanford could not provide the names of the individuals who gave her the money or tell the agents where the transfer took place, nor could she provide any documentation connecting the money to Mike's. When pressed, she claimed that her brother had given her directions and told her that the people with the money would know her.

The agents also made further inquiries about the amount of cash that Stanford was carrying. After initially declaring that she had "about two hundred thousand" dollars, Stanford finally told the agents that the black cellophane-wrapped package contained $79,900.00 and the Christmas-wrapped package contained $162,750.00, for a total of $242,650. Stanford was off by only $166.00, as the packages contained a total of $242,484.00. The money was bundled according to denomination, but the bundles contained different amounts, were of varying thickness, and did not bear the binding of any bank or financial institution.

---

[1] While Stanford was explaining how she came to possess the currency, DEA agents were using a computer terminal in the office to check on the information she provided. The DEA's Narcotics and Dangerous Drug Information System (NADDIS) returned a hit for "Mike's Import and Export NV," a company with a business address in Opa Locka, Florida. The report stated that the business, which had aliases of "Mike's Electronics Import and Export" and "Mike's Import Export," was "Possible [sic] utilized for money laundering."

During the airport interview, "Rambo," a narcotics-detection dog, was brought into the office. Stanford's backpack was placed in a hallway with several other bags of similar size and shape, and Rambo was allowed to inspect them. He alerted to Stanford's backpack. At that point, Stanford had a heated exchange with a DEA supervisor who had just arrived. She then left the room to contact an attorney and ultimately left the airport. The DEA retained the backpack containing the currency. Stanford was never arrested or charged with any crime arising out of these events.

## II. DISCUSSION

Stanford argues that her encounter with DEA agents at the Miami airport constituted a seizure in violation of her Fourth Amendment rights.[2] Because violation of the Fourth Amendment triggers the exclusionary rule, Stanford argues that the district court should have excluded from the government's case-in-chief all evidence gathered during the airport encounter. See One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania, 380 U.S. 692, 702, 85 S. Ct. 1246, 1251 (1965) (holding that the Fourth Amendment's exclusionary rule applies in civil forfeiture cases). The district court denied Stanford's motion to suppress the evidence from the airport encounter after concluding that she was not "seized" within the meaning of the

---

[2] Stanford also argues that the district court improperly struck Mike's Import & Exports, U.S.A.. as a claimant. After oral argument and careful consideration, we reject that argument without need for further discussion.

Fourth Amendment.

Review of a district court's denial of a motion to suppress evidence is a mixed question of law and fact. United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002). We review the district court's findings of fact under the clearly erroneous standard and its application of the law de novo. Id. In reviewing the district court's ruling, this Court must construe the facts in the light most favorable to the party prevailing below, which, in this case, is the government. Id.

Not every encounter between law enforcement officers and individuals constitutes a seizure within the meaning of the Fourth Amendment. United States v. Alvarez-Sanchez, 774 F.2d 1036, 1040 (11th Cir. 1985). The crucial inquiry in deciding whether a given encounter implicates the Fourth Amendment is determining whether, considering all the circumstances, a reasonable person would have believed that she was not free to leave if she refused to answer an officer's questions. Id.

In this case, we have no trouble concluding that no seizure occurred during the initial encounter between Stanford and the DEA agents in the concourse. There is no evidence that Agents Miles and Johnson used any force or coercion. They were not in uniform, they did not touch Stanford or block her path, and they did not display any weapons. They simply approached Stanford, identified themselves as DEA agents, and asked her a few questions. They did request to see her ticket and driver's license,

7

but returned the items almost immediately. Moreover, she was expressly advised that she was not required to cooperate. Because nothing in this initial encounter would lead a reasonable person to believe that she was not free to leave, the district court correctly found that no seizure occurred. See United States v. Mendenhall, 446 U.S. 544, 555, 100 S. Ct. 1870, 1878 (1980).

We next consider the agents' request that Stanford accompany them to their office. "An officer's asking an individual to accompany him or her to an office is an intrusive request that raises a presumption that the individual would not feel free to leave absent exceptionally clear evidence of consent." United States v. Espinosa-Guerra, 805 F.2d 1502, 1507 (11th Cir. 1986) (internal quotation omitted). Under such circumstances, courts should "scrutinize the evidence with care to ensure that the totality of the circumstances shows an utter absence of coercion and hence truly voluntary consent." Id.

The district court relied on several factors in finding "clear evidence" of Stanford's voluntary consent to accompany the agents to the office. It found that Agent Miles asked Stanford to go to the office rather than telling her to do so, that there was no show of force, and that the door to the interview room remained open at all times. The court further found that Stanford never asked to leave or physically attempted to do so. None of these findings are clearly erroneous.

8

In addition to these explicit factual findings, the district court implicitly found that Stanford actively consented to go to the office. In its opinion, the district court acknowledged that "[s]ilently following an officer almost never constitutes sufficient evidence of consent." Order at 8 (quoting Espinosa-Guerra, 805 F.2d at 1508). However, the district court found "clear evidence" that Stanford voluntarily consented to accompany the DEA agents to the office. From this finding, we can infer that the district court credited Agent Miles' testimony that Stanford said "sure" when asked if she would accompany him to the office. Like the district court's explicit factual findings, this implied finding is not clearly erroneous.[3]

The foregoing facts, when construed in the light most favorable to the government, support the district court's finding that Stanford voluntarily consented to go to the DEA office for further questioning. See Mendenhall, 446 U.S. at 557-58, 100 S. Ct. at 1879. We cannot conclude that the district court's finding of consent is clearly erroneous. Stanford was not seized within the meaning of the Fourth Amendment, and the district court's opinion is

**AFFIRMED.**

---

[3] In advancing Stanford's claim, petitioner's counsel has not sufficiently argued, or has entirely waived, any claim that other facts, such as the duration of Stanford's detention, undermined the validity of her consent or caused that consent to expire.